HULETT HARPER STEWART LLP
BLAKE MUIR HARPER (115756)
bmh@hulettharper.com
225 Broadway, Suite 1350
San Diego, CA  92101
Telephone:    (619) 338-1133
Facsimile:    (619) 338-1139

Attorneys for Plaintiff
[Additional Counsel on Signature Page]

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BETTE D. BORENSTEIN, Derivatively on Behalf of Nominal Defendant SEQUENOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> HARRY F. HIXSON, JR., RONALD M. LINDSAY, JOHN A. FAZIO, DAVID PENDARVIS, CHARLES P. SLACIK, MYLA LAI-GOLDMAN, RICHARD A. LERNER, ERNST-GUNTER AFTING, and KENNETH F. BUECHLER, <br><br> Defendants, <br><br> and <br><br> SEQUENOM, INC., <br><br> Nominal Defendant. | Case No.    '13CV2339 JAH NLS <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL** <br><br><br> **JURY DEMAND** |

1.     Plaintiff, Bette D. Borenstein ("Plaintiff"), by and through her undersigned attorneys, bring this derivative complaint (the "Complaint") for the benefit of nominal defendant, Sequenom, Inc. ("Sequenom" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and abuse of control.

## NATURE AND SUMMARY OF THE ACTION

2.     Sequenom has validated and currently offers four laboratory-developed tests ("LDTs") to physicians.  The Company's flagship product is MaterniT21 PLUS, which primarily uses genetic analysis to detect Down syndrome in fetuses through application of a non-invasive test administered to the pregnant mother.  MaterniT21 PLUS is reportedly over 99% accurate and is Sequenom's primary opportunity to obtain and consolidate market share in the rapidly growing, multi-billion dollar genetic testing market.

3.     The genetic testing market is still developing and Sequenom has operated at a net loss since at least 2008.  The Company's strategy for reaching profitability is "to build a strong domestic sales, marketing and reimbursement effort by interacting directly with maternal fetal medicine specialists, obstetricians, opthalmologists, retinal specialists and payors."  To this end, Sequenom uses a two-pronged marketing system that consists of: (a) sending sales representatives to convince doctors to order the Company's tests for their patients; and (b) seeking reimbursement on behalf of the doctors from health insurance companies and other payors.  As related in the Company's most recently filed Form 10-K: Sequenom's "customer service call center and billing support network handle benefits investigation for patients who use its tests. We appeal every claim for [Sequenom's tests] that is denied by a third-party payor in order to support the use and encourage coverage of its tests."

4.     Increased adoption of Sequenom's tests is necessary for the Company

to become profitable.  This is because, the more popular its tests, the more likely that Sequenom will be able to convince large payors to: (a) classify its tests as medically necessary in a greater number of scenarios, and thus pay for the tests; and (b) enter agreements whereby Sequenom's services are treated as in-network, and thus pay for the tests or a greater portion of their price.  As a result, the Company is focused on increasing test orders and payor reimbursement as a route to profitability. Analysts and investors are also focused on the Company's volume of test orders as an indicator of whether its products are gaining acceptance.

5.   The MaterniT21 PLUS test typically costs $2,700.  At present, many health plans do not cover the tests as medically necessary and/or do not cover Sequenom as an in-network provider.  Claims for the full cost of the test are routinely denied.  As a result, at relevant times, many doctors were hesitant to prescribe Sequenom's tests because the high cost would often need be paid directly by the patient.

6.   In September 2012, in order to induce physicians to prescribe the Company's tests in greater numbers, the Company instituted a scheme to cap the potential cost of its test to patients (the "Capping Scheme").  The Capping Scheme functioned this way: the Company's sales representatives and marketing materials would represent to physicians that patient cost per test were capped at $230, and could potentially be reduced to $0.  Doctors would then be more likely to order the test for their patients, without fear of exposing the patients to thousands of dollars in costs.  After a test had been ordered and analyzed, Sequenom would bill the patient's health insurance company the full cost of the test.  If the health insurance company refused to pay part or the entire claim, Sequenom would not seek collection from the patient of the actual amount still owing, the actual deductible, or the actual co-pay.  Instead, Sequenom would bill the patient $230, even if the amount owed was thousands of dollars.  At no time was the existence of the Capping Scheme disclosed publicly.

7.     Upon information and belief, the Capping Scheme violated multiple state and federal laws.  According to the Company's own public filings, the civil monetary penalties imposed for practices such as the Capping Scheme can be up to $10,000 for each wrongful act and can result in exclusion from participation in Medicare and Medicaid, among other civil and criminal penalties.

8.     The Capping Scheme immediately created the desired result.  The volume MaterniT21 PLUS orders had increased slowly, but steadily, since it was introduced in 2011.  However, beginning at the end of the third quarter 2012, the number of tests ordered began to increase much more rapidly.  Between the beginning of the third quarter of 2012 and the first quarter of 2013, the number of MaterniT21 PLUS tests accessioned per quarter increased from 13,000 to 35,000, or more than 150%.  The Company raised its estimate of the "annual run rate" for MaterniT21 PLUS multiple times, from 65,000 in the second quarter of 2012 to 140,000 by the first quarter of 2013.  On these positive results, senior executives and employees throughout the Company were paid bonuses and incentive-based compensation.

9.     The Company purportedly directed its sales force to cease marketing the Capping Scheme at the end of the first quarter 2013, without providing a reason.  Immediately, the volume of tests ordered, and the Company's revenues, dropped.

10.     On July 24, 2013, when the Company announced its disappointing second quarter results, it blamed the drop in tests ordered and revenues on "molecular diagnostics coding changes."  However, the Company misleadingly failed to disclose that the end of the Capping Scheme was a major cause of the disappointing results.

11.     Each of the defendants have breached their fiduciary duties in connection with the allegations herein.  The defendants reviewed and approved of the Capping Scheme, and had a duty to oversee core elements of the Company's business, such as its strategy for achieving its primary goal: increased adoption of its

flagship product.  The defendants knowingly permitted the Company to misleadingly fail to disclose the Capping Scheme as the cause of the rapid increase in MaterniT21 PLUS accessions during the fourth quarter of 2012 and the first quarter of 2013, and they knowingly permitted the Company to misleadingly fail to disclose that the end of the Capping Scheme was a major cause of the Company's disappointing second quarter 2013 results.  The Company has been seriously harmed by these breaches of fiduciary duties.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Plaintiff is a citizen of Alabama, and no Defendant is a citizen of that state.  This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

13.    Venue is proper in this Court because Sequenom maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Director Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

14.    Plaintiff is, and was at all times relevant hereto, an owner and holder of Sequenom common stock.

**Defendants**

15.    Nominal defendant Sequenom is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 3595 John Hopkins Court, San Diego, California.  According to its public filings, Sequenom is a life sciences company providing genetic analysis solutions through

4

two operating segments: (a) Molecular Diagnostics; and (b) Genetic Analysis. Sequenom's common stock trades on the NASDAQ Exchange under the symbol "SQNM."

16.     Harry F. Hixson, Jr. ("Hixson") has served as the Chairman of the Board since 2003 and as Chief Executive Officer ("CEO") since 2009.   Upon information and belief, defendant Hixson is a citizen of California.

17.     Ronald M. Lindsay ("Lindsay") currently serves as the Executive Vice President, Strategic Planning, of Sequenom.  Lindsay has served as a director since 2003.  Upon information and belief, defendant Lindsay is a citizen of Massachusetts.

18.     John A. Fazio ("Fazio") has served as a member of the Sequenom Board since 2007.  Fazio is the Chair of the Audit Committee.  Upon information and belief, defendant Fazio is a citizen of Florida.

19.     David Pendarvis ("Pendarvis") has served as a director of Sequenom since 2009.  Pendarvis is a member of the Audit Committee and is the Chair of the Compensation Committee.  Upon information and belief, defendant Pendarvis is a citizen of California.

20.     Charles P. Slacik ("Slacik") has served as a director of Sequenom since 2011.  Slacik is a member of the Audit Committee.  Upon information and belief, defendant Slacik is a citizen of California.

21.     Myla Lai-Goldman ("Lai-Goldman") has served as a director of Sequenom since 2012.  Lai-Goldman is a member of the Nominating and Corporate Governance Committee and the Science Committee.  Upon information and belief, defendant Lai-Goldman is a citizen of North Carolina.

22.     Richard A. Lerner ("Lerner") has served as a director since 2007. Lerner is a member of the Nominating and Corporate Governance Committee, the Compensation Committee, and the Science Committee.   Upon information and belief, defendant Lerner is a citizen of California.

23.     Ernst-Gunter Afting ("Afting") has served as a director since 1996.

5

Afting is the Chair of the Nominating and Corporate Governance Committee and a member of the Science Committee.  Upon information and belief, defendant Afting is a citizen of Germany.

24.     Kenneth F. Buechler ("Buechler") has served as a director since 2009. Buechler is a member of the Compensation Committee and the Chair of the Science Committee.   Upon  information  and  belief,  defendant  Buechler  is  a  citizen  of California.

25.     The defendants referenced in ¶¶ 16-24 shall be collectively referred to herein as the "Director Defendants."

## DEFENDANTS' DUTIES

26.     By reason of their positions as officers, directors, and/or fiduciaries of Sequenom and because of their ability to control the business and corporate affairs of Sequenom, Defendants owed Sequenom and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Sequenom in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Sequenom and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Sequenom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

27.     Defendants, because of their positions of control and authority as directors and/or officers of Sequenom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Sequenom, each of the Defendants had knowledge of material non-public information regarding the

6

Company.

28.     To discharge their duties, the officers and directors of Sequenom were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Sequenom were required to, among other things:

a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

c.     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

d.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

29.     At relevant times, the price charged by Sequenom to payors for the MaterniT21 PLUS test and reading of results was $2,700 per test.  Because the test is a new technology and Sequenom CMM is "out of network" on many large healthcare networks, doctors were reticent to prescribe MaterniT21 PLUS.  Without payment coverage, their clients could end being forced to pay the entire cost or a large portion thereof.  The Company's inability to secure agreements from more medical payors both permitting it to become an "in network" provider and deeming its tests to be medically necessary, is the primary obstacle to increased orders for Sequenom's tests.

30.     According to Sequenom's public filings with the SEC, the Sequenom Board and its committees met regularly during 2012.  As shown below, during those Board meetings, the Board reviewed and discussed Sequenom's strategy and other core elements of the Company's business, including the Company's pricing and marketing efforts with respect to MaterniT21 PLUS and the other tests.  During 2012, the Board reviewed and approved or acceded to the implementation of the Capping Scheme.

31.     On March 9, 2012, the Company filed its Form 10-K for the 2011 fiscal year.  The Form 10-K was signed by defendants Hixson, Afting, Buechler, Fazio, Lerner, Lindsay, Pendarvis, and Slacik, and acknowledged the importance to the Company of its marketing activities and the potential harm that could behalf Sequenom if it engaged in illegal pricing or marketing activities:

> Because [Sequenom's LDTs] have only recently been launched, demand for and reimbursement by payors of these tests is uncertain. Because certain of the molecular diagnostic LDTs Sequenom CMM has launched or intends to launch as a testing service may not be medically necessary or may otherwise not be subject to reimbursement by payors, it is difficult to know how much demand there will be for such tests by physicians.

> In the United States, the regulatory process allows diagnostic tests to be marketed regardless of any coverage determinations made by payors. For new diagnostic tests, each third-party payor makes its own decision about which tests it will cover, how much it will pay and whether it will continue reimbursing the test. *Clinicians may order diagnostic tests that are not reimbursed by third-party payors if the patient is willing to pay for the test without reimbursement, but coverage determinations and reimbursement levels and conditions are critical to the commercial success of a diagnostic product.*

> CMS, an agency within the Department of Health and Human Services, establishes reimbursement payment levels and coverage rules for Medicare. CMS currently does not cover the MaterniT21 PLUS LDT. State Medicaid plans and third-party payors establish rates and coverage rules independently. As a result, the coverage determination

process is often a time-consuming and costly process that requires us to provide scientific and clinical support for the use of our tests to each payor separately, with no assurance that approval will be obtained. If CMS or other third-party payors decide not to cover our diagnostic tests, including the MaterniT21 PLUS LDT, place significant restrictions on the use of our tests, or offer inadequate payment amounts, our ability to generate revenue from our diagnostic tests could be limited.

\* \* \*

**Our failure to comply with governmental payor regulations could result in our being excluded from participation in Medicare, Medicaid or other governmental payor programs, which would decrease our revenues and adversely affect our results of operations and financial condition.**

The Medicare program is administered by CMS, which, like the states that administer their respective state Medicaid programs, imposes extensive and detailed requirements on diagnostic services providers, including, but not limited to, rules that govern how we structure our relationships with physicians, how and when we submit reimbursement claims and how we provide our specialized diagnostic services. *Our failure to comply with applicable Medicare, Medicaid and other governmental payor rules could result in our inability to participate in a governmental payor program, our returning funds already paid to us, civil monetary penalties, criminal penalties and/or limitations on the operational function of our laboratory. If we were unable to receive reimbursement under a governmental payor program, a substantial portion of our revenues would be lost, which would adversely affect our results of operations and financial condition.*

\* \* \*

Federal law prohibits any entity from offering or transferring to a Medicare or Medicaid beneficiary any remuneration that the entity knows or should know is likely to influence the beneficiary's selection of a particular provider, practitioner or supplier of Medicare or Medicaid payable items or services, *including waivers of copayments and deductible amounts (or any part thereof) and transfers of items or services for free or for other than fair market value. Entities found in*

9

*violation may be liable for civil monetary penalties of up to $10,000 for each wrongful act.* Although we believe that our sales and marketing practices are in material compliance with all applicable federal and state laws and regulations, relevant regulatory authorities may disagree and violation of these laws, or, our exclusion from such programs as Medicaid and other governmental programs as a result of a violation of such laws, could have a material adverse effect on our business, results of operations, financial condition and cash flows.

(Bold emphasis in original, italics emphasis added.)

32.     On July 26, 2012, Sequenom issued a press release announcing its second quarter 2012 results and increasing its "Full-Year MaterniT21 PLUS Test Volume Goal to 50,000." The press release reported in part:

Sequenom CMM accessioned more than 20,000 total tests in the second quarter of 2012, including in excess of 13,000 MaterniT21 PLUS LDTs. Total tests accessioned increased by 55%, while MaterniT21 PLUS LDTs increased 165% during the second quarter of 2012.

This brings the total number of MaterniT21 PLUS LDTs accessioned to more than 20,000 since the initial product launch in the fall of 2011. At the close of the first quarter of 2012, the 52-week run rate of MaterniT21 PLUS samples accessioned equated to approximately 30,000 tests. As of the last week in June 2012, the annualized run rate had increased to approximately 65,000 tests.

Due to the successful growth in adoption year-to-date, the Company is increasing its internal goal from 40,000 MaterniT21 PLUS tests billed to 50,000 MaterniT21 PLUS tests billed in 2012. This increase doubles the original goal of billing 25,000 tests in 2012, as announced in January of this year.

33.     At the beginning of September 2012, Sequenom convened a national conference call of its sales force. During the call, certain senior executives were present, including, among others, William Welch, Senior Vice President, Diagnostics. During the call, the sales force was directed to employ a new pricing strategy in an effort to increase test order volumes. The new pricing strategy was the Capping Scheme. The Capping Scheme sought to "cap" the cost liability that

10

the Company would impose on a patient after a payor declined to cover all or part of the $2,700 MaterniT21 PLUS cost.  Sales representatives were directed to approach doctors and explain that under the Capping Scheme, any test-related liability to the patient would be no higher than $230.  Representatives were further directed to tell doctors that if a patient could not afford the $230 amount, the Company would be willing to reduce that liability to $0 after receiving a phone call from the patient.

34.     Under the Capping Scheme, the Company would submit fraudulent claims to private or government payors seeking reimbursement at $2,700 per MaterniT21 PLUS test.  However, the true cost of the MaterniT21 PLUS test was only $230, as patients would be required to pay no more than that amount.  This arrangement knowingly violated numerous federal and state laws.

35.     The Capping Scheme was thereafter implemented nationwide.  The Scheme's existence was discussed in numerous internal and marketing documents, including a brochure distributed to doctors.  Almost immediately, the Capping Scheme led to an increased volume of test orders.

36.     On November 8, 2012, the Company issued a press release reporting its financial results for the third quarter of 2012.  The press release stated the following in part:

> Sequenom CMM accessioned approximately 26,000 total test samples in the third quarter of 2012, including nearly 18,000 MaterniT21 PLUS test samples. Sequenom CMM celebrated the one-year anniversary of the commercial availability of the MaterniT21 PLUS LDT with a total of approximately 37,000 samples accessioned since the launch in the fall of 2011. At the close of October 2012, the annualized run rate of MaterniT21 PLUS samples accessioned was more than 90,000 test samples, an average of more than 1,700 samples weekly. Sequenom CMM now expects to significantly exceed its previously announced internal goal of 50,000 MaterniT21 PLUS tests billed for 2012.

37.     Upon information and belief, the Sequenom Board and its committees met regularly during 2013.  During those Board meetings, the Board reviewed and discussed Sequenom's strategy and other core elements of the Company's business, including the Company's pricing and marketing efforts with respect to MaterniT21 PLUS and the other tests, and specifically, the Capping Scheme.

38.     On January 6, 2013, the Company issued a press release announcing "preliminary operational highlights" of the 2012 fiscal year.  The press release announced more than 92,000 total prenatal and retinal tests accessioned during the year, "strong increases in the adoption rate and sales of" the MaterniT21 PLUS test, more than 60,000 MaterniT21 PLUS tests accessioned in 2012, and an "annualized run rate of more than 120,000 MaterniT21 PLUS tests accessioned at the end of 2012."

39.     On January 9, 2013, the conducted a conference call for analysts in connection with its presentation at the JPMorgan Global Healthcare Conference. During the call, defendant Hixson misleadingly omitted to disclose the Capping Scheme when he sought to explain the increased orders for Sequenom tests:

> [Defendant Hixson:]
>
> In 2012, we had rather spectacular achievement against our goals. We started out with a sales force of 20 which we had planned to increase to 50 later in year, and we did that and we did a second addition and it went to 75 in Q3. We added publication of T13 and T18 clinical studies in Q1. That had a major impact on physician's acceptance of our test.

40.     At the end of February 2013, the Company announced to its sales force that the Capping Scheme was being discontinued and that prices under the Scheme would no longer be honored after March 1, 2013.  However, on information and belief, the deadline was extended on multiple occasions and the Company continued to offer Capping Scheme prices until at least April 1, 2013.

41.     On March 7, 2013, the Company issued a press release reporting its

12

financial results for the fourth quarter and full year of 2012.  Due largely to a strong increase in fourth quarter test orders, the Company disclosed the following:

> SCMM accessioned approximately 92,000 total test samples in 2012, including more than 61,000 MaterniT21 PLUS test samples. At the close of December 2012, the annualized run rate for the MaterniT21 PLUS test was more than 120,000 test samples accessioned, an average of more than 2,300 samples weekly.

> During the fourth quarter, Sequenom recorded significant increases in revenues, in the amount of $18.2 million, based on cash collections for samples accessioned in prior periods and the increase in total volumes of samples processed by SCMM. Positive decisions supporting the use of noninvasive prenatal testing in high-risk pregnant women were granted jointly from the American College of Obstetricians and Gynecologists Committee on Genetics and the Society for Maternal-Fetal Medicine Publications Committee, as well as The California Technology Assessment Forum. Recent positive coverage decisions have been issued by national and regional payors for high-risk pregnancies, and are expected to contribute to stronger revenues over time.

> Most recently, SCMM announced that the MaterniT21 PLUS test now reports on the presence of fetal sex chromosomal aneuploidies, in addition to its identification of aneuploidies for chromosomes 21, 18 and 13.

> In response to sustained growth in sample volume, SCMM is in the process of increasing its MaterniT21 PLUS test capacity by completing the build out and initiating the validation of an additional location in North Carolina. This new location is expected to be operational in the second half of 2013 and will increase the total non-invasive prenatal testing capacity to a minimum of 300,000 tests per year.

> SCMM also continues to expand access to its testing services for physicians and their patients by hiring additional field sales representatives. The sales force is expected to grow to more than 85 representatives across the U.S. by the end of the first quarter 2013.

42.     Later on March 7, 2013, the Company conducted a conference call for investors and analysts to discuss the fourth quarter and full year results.  During the

13

call, when asked an analyst question about the increased run rate of test orders, defendant Hixson misleadingly omitted to disclose the existence of the Capping Scheme:

> [Analyst:]
>
> Hi. Good afternoon. So, the volume rate – I know somebody already asked you about the run rate, but *the volume run rate in December increased to about 120,000. That was really strong acceleration from November.* You said that it continues to grow so far this year, but are you talking year-over-year? Or is it still growing sequentially from December?
>
> [Defendant Hixson:]
>
> The trajectory we saw in the fourth quarter has continued into the first quarter.

(Emphasis added.)

43.   On March 13, 2013, the Company conducted a conference call in connection with its presentation at the Barclays Capital 2013 Global Healthcare Conference.  During the call, defendant Lindsay and other Sequenom representatives discussed the increased adoption of the Company's tests, but misleadingly failed to disclose the existence of the Capping Scheme.  The following was said:

> [Defendant Lindsay:]
>
> So, we launched this test on October of 2011, and I think it's fair to say over the course of the full first – full year of 2012. And we initially gave an estimate or a scenario JP Morgan I think in the beginning of the year, an estimate of maybe 25,000, an optimistic 40,000 and potentially a very optimistic 50,000 tests.
>
> We're happy to say the adoption rate exceeded that and by the end of about full year we have accession of over 60,000 samples. And by the end of the year our run rate for the test was approximately 120,000 samples per year when annualized.
>
> * * *

14

We think all the clinical data supports they use from the high risk group, some of our competitors are actually working in the low risk patients. We don't believe there is adequate data as yet to move into that group. So we abide by the guidelines that have been recommended by various societies.

Just, by itself the high risk group is a pretty large opportunity. There are about 750,000 patients who would fall into this group annually in the US of which age is by far the biggest about 600,000 plus. So, this is our target market for the moment. And I think if you – the rate we achieved at the end of the last year of 120,000 annualized tests at the end of the year, we've already begun to penetrate somewhere north of 15% of this market and we continue to expect this growth as we go forward.

* * *

[Chief Accounting Officer, Paul Maier:]

For our Sequenom Center for Molecular Medicine, we have a goal of accessioning 150,000 MaterniT21 PLUS tests this year. We also have achieved two goals thus far, one that we achieved in the first quarter was extending the content of the MaterniT21 PLUS test to include sex chromosome (inaudible). The other goal that we established was to expand the diagnostic sales force. By the end of the first quarter we expect to have more than 85 reps in the field which gives us excellent coverage and more importantly allows us to call on the key positions in this marketplace on a monthly basis.

* * *

We are showing a range of adopting scenarios for 2013. Our goal is the lower curve, the 150,000 units. We're showing what the possibilities might be if the growth rate continues to grow at a very nice pace of 150,000 or 200,000 units. To be prepared to deal with that, we will have in place a capacity after the North Carolina facility comes online, to annually run up to 300,000 tests. So we've always felt that was important to have plenty of capacity in place to meet the market demand.

One of the anomalies of a new test is the accounting for the results. In our case, we are using the cash method of accounting for our revenue, for our diagnostic test. And as a result what you see is the cost being

15

incurred upfront when we run the test, the revenue cycle particularly in the first year of launch may lag 120 even up to 180 days after the test is performed. So as a result it's very difficult to predict so we use the cash basis. And ultimately our goal is to move to accrual accounting and only then we'll – you have a better idea of matching the revenues and the expenses to do that, we need to put a billing process in-house, in-place. And our goal is to do that this year.

44.     On April 2, 2013, the Company filed its Form 10-K for the 2012 fiscal year with the SEC.   The Form 10-K was signed by defendants Hixson, Afting, Buechler, Fazio, Lai-Goldman, Lerner, Lindsay, Pendarvis, and Slacik, and stated in part:

We are subject to various federal, state and local laws targeting fraud and abuse in the health care industry, including anti-kickback and false claims laws. *The federal Anti-Kickback Statute prohibits persons from knowingly and willfully soliciting, offering, receiving or providing remuneration, directly or indirectly, in exchange for or to induce either the referral of an individual, or the furnishing or arranging for a good or service, for which payment may be made under a federal health care program, such as Medicare or Medicaid.* The definition of "remuneration" has been broadly interpreted to include anything of value, including, for example, gifts, discounts, the furnishing of free supplies, equipment or services, credit arrangements, payments of cash and waivers of payment. Several courts have interpreted the statute's intent requirement to mean that if any one purpose of an arrangement involving remuneration is to induce referrals of federal healthcare covered business, the statute has been violated. The PPACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and certain criminal health care fraud statutes to provide that, effective March 23, 2010, a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the PPACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act or the civil monetary penalties statute, which imposes penalties against any person who is determined to have presented or caused to be presented a claim to a federal health program that the person knows or

16

should know is for an item or service that was not provided as claimed or is false or fraudulent.

The Anti-Kickback Statute is broad and prohibits many arrangements and practices that are lawful in businesses outside of the health care industry. Recognizing that the Anti-Kickback Statute is broad and may technically prohibit many innocuous or beneficial arrangements, Congress authorized the HHS Office of Inspector General, or OIG, to issue a series of regulations, known as "safe harbors." These safe harbors set forth requirements that, if met in their entirety, will assure health care providers and other parties that they will not be prosecuted under the Anti-Kickback Statute. The failure of a transaction or arrangement to fit precisely within one or more safe harbors does not necessarily mean that it is illegal, or that prosecution will be pursued. However, *conduct and business arrangements that do not fully satisfy each applicable safe harbor may result in increased scrutiny by government enforcement authorities, such as the OIG*. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions such as fines, imprisonment and possible exclusion from Medicare, Medicaid and other healthcare programs. Many states have adopted laws similar to the Anti-Kickback Statute. Some of these state prohibitions apply to referral of patients for health care items or services reimbursed by any payor, not only the Medicare and Medicaid programs, and do not contain identical safe harbors. Government officials have brought cases against numerous companies and certain sales and marketing personnel for allegedly offering unlawful inducements to potential or existing customers in an attempt to procure their business.

\* \* \*

Another development affecting the health care industry is the increased use of the federal civil False Claims Act and, in particular, actions brought pursuant to the False Claims Act's "whistleblower" or "qui tam" provisions. The False Claims Act imposes liability on any person or entity that, among other things, knowingly presents, or causes to be presented, a false or fraudulent claim for payment by a federal health care program. The qui tam provisions of the False Claims Act allow a private individual to bring actions on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased

17

dramatically. *In addition, various states have enacted false claim laws analogous to the False Claims Act. Many of these state laws apply where a claim is submitted to any third-party payor and not merely a federal health care program. When an entity is determined to have violated the False Claims Act, it may be required to pay up to three times the actual damages sustained by the government, plus civil penalties of $5,500 to $11,000 for each separate false claim. There are many potential bases for liability under the False Claims Act. Liability arises, primarily, when an entity knowingly submits, or causes another to submit, a false claim for reimbursement to the federal government.* The False Claims Act has been used to assert liability on the basis of, among other things, inadequate care, kickbacks and other improper referrals, improper use of Medicare numbers when detailing the provider of services, and allegations as to misrepresentations with respect to the services rendered. Our activities relating to the sale and marketing of our products may be subject to scrutiny under these laws. Also, HIPAA created several new federal crimes, including health care fraud and false statements relating to health care matters. *The health care fraud statute prohibits knowingly and willfully executing a scheme to defraud any health care benefit program, including private third-party payors. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for health care benefits, items or services.* We are unable to predict whether we would be subject to actions under the False Claims Act or a similar state law, or under the federal crimes created by HIPAA, or the impact of such actions. However, the costs of defending such claims, as well as any sanctions imposed, could significantly adversely affect our financial performance.

*Federal law prohibits any entity from offering or transferring to a Medicare or Medicaid beneficiary any remuneration that the entity knows or should know is likely to influence the beneficiary's selection of a particular provider, practitioner or supplier of Medicare or Medicaid payable items or services, including waivers of copayments and deductible amounts (or any part thereof) and transfers of items or services for free or for other than fair market value. Entities found in violation may be liable for civil monetary penalties of up to $10,000 for each wrongful act.* Although we believe that our sales and marketing practices are in material compliance with all applicable

federal and state laws and regulations, relevant regulatory authorities may disagree, and violation of these laws or our exclusion from such programs as Medicaid and other governmental programs as a result of a violation of such laws could have a material adverse effect on our business, results of operations, financial condition and cash flows.

(Emphasis added.)

45.     On May 9, 2013, the Company issued a press release announcing its financial results for the first quarter of 2013.   The results included artificially inflated test volume and revenue numbers due to the Capping Scheme, however the Company did not disclose the true cause of the results.  The press release stated in part:

> "The volume of 35,000 MaterniT21™ PLUS tests accessioned in the first quarter shows that Sequenom CMM continued to take advantage of its first mover position in the non-invasive prenatal diagnostic (NIPT) market by increasing its penetration of the NIPT market and maintaining its dominant market share. The recent announcement that Sequenom CMM had accessioned over 100,000 MaterniT21 PLUS test samples since the test was launched in October of 2011 is further evidence of the remarkable success of this testing service," said Harry F. Hixson, Jr., Ph.D., Chairman and CEO of Sequenom. "Furthermore, we are making progress in our negotiations within the payor community, with more than 70 million patients now under coverage who have access to the MaterniT21 PLUS test."
>
> * * *
>
> Total cost of revenues increased to $24.5 million for the first quarter of 2013, compared to $10.3 million for the prior year period. Cost of revenues increased primarily due to the significant increase in Sequenom CMM's test volumes and costs to support increased testing capacity, as total tests accessioned increased 250% to more than 44,500 patient samples during the first quarter of 2013. Approximately 35,000 of those patient samples tested during the first quarter were MaterniT21 PLUS test samples, compared to approximately 25,000 in the fourth quarter of 2012, growing 40% sequentially.
>
> * * *

19

The Company recently reported that Sequenom CMM had processed 100,000 MaterniT21 PLUS samples since launch of the testing service in October 2011, reflecting the overwhelmingly positive response from the physician community based on the superior attributes of the test and customer support offered by Sequenom CMM. Nearly 60% of maternal-fetal medicine specialists and more than 3,300 OBGYN physicians in the United States have ordered the test since its introduction.

The annualized run rate for the MaterniT21 PLUS test at the end of the first quarter surpassed 140,000 samples. This growth has continued with a record number of samples accessioned in the last week of April and Sequenom CMM expects to exceed 150,000 samples accessioned for all of 2013.

46.     On July 24, 2013, the Company issued a press release announcing its financial results for the second quarter of 2013.  The results demonstrated that no sooner had the Capping Scheme been halted, than the Company's test orders volume and revenue were impacted.  The press release stated in part:

Along with many other companies in the diagnostics industry, Sequenom CMM experienced delays in receipt of payments as a result of molecular diagnostics coding changes adopted by CMS, Medicaid and third party payors. These changes include the elimination and replacement of certain molecular diagnostics billing codes. Several payors are requesting additional information to process claims for services, and certain payors, including most state Medicaid plans, have not implemented the new codes, or in some cases are no longer providing coverage for certain tests. In addition to the impact of these coding changes, Sequenom CMM transitioned from an out-sourced billing provider to an in-house billing system during the quarter, and lower than expected collections by the external billing provider also contributed to the decline in diagnostic revenues.

* * *

"We are disappointed by the delay in the collection of diagnostic segment revenues during the second quarter, as pressure associated with coding and billing policies on the national level are slowing the timing of reimbursement. We are in the process of working through these challenges and expect to see improvements in collections during

20

the second half of 2013," said Paul V. Maier, Sequenom's CFO. "We have seen remarkable growth in the last year, but we have also identified opportunities for renewed efficiencies with regard to our spending plans in the last half of this year. Going forward, we plan to implement expense reduction initiatives to reduce our net operating loss as we work to improve reimbursement."

* * *

Total tests accessioned increased nearly 130% to 46,700 patient samples during the second quarter of 2013. Approximately 38,000 of those patient samples tested during the second quarter were MaterniT21 PLUS test samples, compared to approximately 35,000 in the first quarter of 2013, growing approximately 9% sequentially.

47.     Later on July 24, 2013, the Company conducted a conference call. During the call, defendant Hixson and other Sequenom representatives misleadingly failed to mention the end of the Capping Scheme as a cause of the Company's disappointing results.  The following statements were made:

[Defendant Hixson:]

Sequenom CMM accessioned nearly 38,000 MaterniT21 PLUS test samples this quarter, a 9% increase over the previous quarter. This equates to a run rate of approximately 150,000 test accessioned annually. The increase in the number of competitors in the field has moderated our growth rate as anticipated.

Along with many other companies in the diagnostics industry, Sequenom CMM experience delays in receipt payment as a result of molecular diagnostic coding changes adopted by CMS, Medicaid and third-party payors. These changes include the elimination or placement of certain molecular diagnostic billion codes.

Several payors are requesting additional information to process claims for services, and certain payors, including most state Medicaid plans, have not implemented the new codes, or in some cases are no longer providing coverage for certain tests. This is an industry-wide phenomenon.

21

* * *

[Analyst:]

Hi. Good afternoon guys. Harry, just one, which I did miss, I think, did you guys -- are you comfortable giving any kind of expectation on volumes for the year at this point?

[Defendant Hixson:]

Well, as you know, our internal goal has been of 150,000 test accession during the year. We -- the week before last we set a record and we have been experiencing growth that Paul described. If we curtail the offering of our services to certain payors because they are not paying us that may have an impact and make it more difficult for us to achieve our internal goal of a 150,000.

[Analyst:]

So, have you started the curtailment -- did any of the curtailment happened in the second quarter or is all of that kind of forward-looking, let's say July 1 onwards?

[Defendant Hixson:]

It's all July 1 onward, forward looking.

[Analyst:]

So if that was the case, the sequential growth that you saw was only 9% this quarter. You alluded on the call to over a bit of a competitive pressure. And you said that's expected but that would have been a lower kind of growth that's going on as it was competitive -- that was our growth and we would have thought is the competitive pressure getting more significant to you guys at this point that would have impacted the 38,000 in the quarter if there was no curtailment this quarter?

[President and Chief Operating Officer, Bill Welsh:]

Sure, this is Bill Welch. Brian, I think it is fair to say that there is competition and the competition is heated up. And so, I think, yeah we have foreseen that. I think it's a still broad market. Some of the competition has partnered with various reference labs and so there is

22

some restrictions in distribution as opposed to demand by positions and this is a -- this coding changes is a very transitional and impactful one to our industry. I know that where it is going to be thinking about profitable units as opposed to just units. And we have always thought about that. We state as you know in high risk segment, which is generally more commercial payor market.

Many of our competitors actually they, as far as I know, do not restrict where they use their products and that does put some pressure on us. But I think it's good management now looking back that keeping the line to high risk and keeping the line to those groups is going to help us in (inaudible) pressure maybe to how they're doing things.

* * *

[Analyst:]

First one for me guys, just curious why didn't you preannounce the quarter?

[Defendant Hixson:]

Hello. I find that to be a strange question. We announced the quarter when we are firm and we know what the numbers will be. Paul?

[Paul Maier:]

And we actually accelerated the timing of this quarter's call versus what we normally schedule the timing. So we just completed our process of reviewing the quarter. We had a quarterly Board meeting to review the results and that resulted in our accelerated timing this week.

[Analyst:]

Okay. All right. Fair enough. And then what percent of payors are not paying that did before the coding changes came out and then kind of a related question here, but what percent of tests do you ultimately expect to collect?

[Defendant Hixson:]

Well, there is a payor mix that we've got in our corporate slide and had for quite some time on the high risk and generally speaking 200 fund it is around 70% or so commercial payors and the other are more

23

government payors, and that's representative of the high risk (inaudible) market driven primarily by those over 35. That's been our, as you know, which help the line very tightly on that.

If one were to use the general population, I believe the overall government payors is more like a 50-50 or 60-40 commercial to government. So that's kind of where we've always had been and we stayed that course.

[Paul Maier:]

Yeah. You may have been asking about what percent of tests that we perform get reimburse and I assume that was the intent of your question in addition to where is it coming from and we don't disclose that information and of course, because of the payment cycle sometimes can be long that those numbers are constantly changing.

And we monitor those payors pretty closely and of course with the commercial payors we are involved in dialogue and with the government related payors we're also involved in dialogues, and getting reimbursement, and so we deal with that on a case-by-case basis, but I don't think that we will be reporting that information to the market.

* * *

[Analyst:]

Okay. And you've mentioned in your prepared remarks that some payors, they're asking for more information and that's also causing some of the delays. What sort of -- are you able to get into what sort of information they're asking for. They look to pay more attention to the patient's age and to other high risk factors. I mean, what else are they asking for?

[Defendant Hixson:]

Part of this is tied to the coding change. Just to remind us we had a number of stack codes and like a diagnostic and they did away with all those codes and brought in a Tier 1 then other types of codes. We use for MaterniT21 PLUS a miscellaneous code for molecular which were supposed to use unfortunately many, many other unrelated test also use that code. And so payors use that as an opportunity to say what is this

24

code, can I get more information and how it's used. Unrelated to our test or anything, within our group there is certain payors to say why see this code I see what you have but I may have more questions for you as it applies to this for prenatal care. And that could be it's a really high risk rather things they may ask about. For these two issues, one the coding issue delay and one could be about the prenatal side.

\* \* \*

[Analyst:]

And which test service exactly are you curtailing due to a lack of reimbursement?

[Defendant Hixson:]

I don't think we're going to say which test or with which payors groups at this time.

48.     Sequenom's second quarter 2012 press release and statements made by Company representatives during the investor conference call, blamed medical coding issues for the poor results, and misleadingly omitted the change in pricing strategy.  The Director Defendants, who were aware both of the imposition of the Capping Scheme, and of its termination, knew that the Company's disclosures related to the second quarter 2013 results were deceptive and misleading.  Yet, they took no action to halt them or to correct them once they had been issued.

49.     On July 24, 2013, the *Associated Press* published an article titled "Sequenom tumbles on test payment concerns."  The article reported in part:

> The company said MaterniT21 testing rose 9 percent compared to the first quarter of 2013, compared to 40 percent growth from the fourth quarter to the first quarter.

50.     On July 24 and 25, 2013, Sequenom stock was downgraded by William Blair, Ladenburg Thalmann, and Lazard Capital.

51.     The Director Defendants are directly responsible for the decision to implement the Capping Scheme, which they reviewed and/or approved prior to its

implementation.   The Director Defendants knowingly permitted the Company to issue repeated misleading disclosures without correcting them.  No action, legal or otherwise, has been taken against any current or former director or officer in connection with the misleading disclosures.   The entire Board as currently comprised is responsible for these breaches of fiduciary duties. Thus, demand on the Board is futile and therefore excused.

## DAMAGES TO THE COMPANY

52.   Sequenom has been, and will continue to be, severely damaged and injured by the Director Defendants' misconduct.  As a direct and proximate result of the Director Defendants' conduct, Sequenom has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

a.   a decreased ability to obtain financing to sustain continued operations at a loss;

b.   costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

c.   costs incurred in incentive and/or bonus compensation paid to employees based on artificially inflated test accession numbers;

d.   substantial loss of market capital;

e.   costs already incurred defending government investigations, subpoenae, and suits; and

f.   any fines that are a result of the Company's violations federal and state law.

53.   In addition, Sequenom's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company has still not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

54.   The actions complained of herein have irreparably damaged

26

1   Sequenom's corporate image and goodwill. For at least the foreseeable future,
2   Sequenom will suffer from what is known as the "liar's discount," a term applied to
3   the stocks of companies who have been implicated in illegal behavior and have
4   misled the investing public, such that Sequenom's ability to raise equity capital or
5   debt on favorable terms in the future is now impaired.

6                   **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

7           55.     A pre-suit demand on the Sequenom Board is futile, and therefore,
8   excused. This is because despite knowing that the Capping Scheme was illegal, the
9   Board approved its implementation, knowingly declined to require the Company to
10  disclose its existence, and then permitted the Company to issue misleading and
11  untruthful disclosures regarding the financial results impacted by the Scheme. The
12  Director Defendants affirmative participation in an illegal scheme, and knowing
13  complicity in the concealment of same could not have been legitimate exercises of
14  good faith business judgment. By participating in this course of conduct, the
15  Director Defendants exposed the Company to severe damage and injury.
16  Consequently, the Director Defendants face a substantial risk of liability for
17  breaches of good faith and loyalty, rendering them unable to fairly and objectively
18  evaluate a pre-suit demand. Thus, demand on the Board is futile, and therefore
19  excused.

20          56.     The current Board of Sequenom consists of the following nine
21  individuals: defendants Hixson, Lindsay, Afting, Buechler, Fazio, Lai-Goldman,
22  Lerner, Lindsay, Pendarvis, and Slacik. Of these nine defendants, all nine were
23  members of the Board since prior to the imposition of the Capping Scheme. All
24  nine were present for Board meetings during which the Capping Scheme was
25  discussed, all nine collectively declined to take action to require the Company to
26  operate legally, and all nine thereafter permitted the Company to make false
27  disclosures. The Director Defendants have refused to hold those responsible,
28  including their fellow directors, accountable.

57.     Defendant Hixson is the current CEO and Chairman of Sequenom.  As such, he is primarily employed by the Company and his professional reputation is inextricably bound to his role at Sequenom.  Defendant Hixson was compensated $2.37 million in 2012 for his role as CEO of Sequenom.  He will receive a similar level of compensation in 2013.  Defendant Hixson's compensation for both 2012 and 2013 includes incentive compensation paid because of benchmarks achieved in the marketing of MaterniT21 PLUS and other tests which is attributable to the Company's illegal Capping Scheme.  It is thus directly against defendant Hixson's substantial financial interest for him to pursue this suit on the Company's behalf. Moreover, defendant Hixson presided over and acquiesced in the implementation of the Capping Scheme and the corresponding misleading disclosures.   Due to defendant Hixson's complicity in the wrongdoing alleged herein, his knowing decision to permit false statements, and his conflicted status as CEO, Hixson is not capable of disinterestedly and independently considering a demand.   As result, demand on defendant Hixson is futile.

58.     Defendant Lindsay is primarily employed as Sequenom's Executive Vice President, Strategic Planning, in addition to being a director.  Defendant Lindsay was compensated $1.05 million in 2012, and he will receive a similar level of compensation in 2013.  Defendant Lindsay's compensation for both 2012 and 2013 includes incentive compensation paid because of benchmarks achieved in the marketing of MaterniT21 PLUS and other LDTs which is attributable to the Company's illegal Capping Scheme.  It is thus directly against defendant Lindsay's substantial financial interest for him to pursue this suit on the Company's behalf. Moreover, defendant Lindsay presided over and acquiesced in the implementation of the Capping Scheme and the corresponding misleading disclosures.   Due to defendant Lindsay's complicity in the wrongdoing alleged herein, his knowing decision to permit false statements, and his conflicted status as CEO, Lindsay is not capable of disinterestedly and independently considering a demand.   As result,

1   demand on defendant Lindsay is futile.

2        59.    Defendants Fazio, Pendarvis, and Slacik are the members of
3   Sequenom's Audit Committee.  Fazio is the Chairperson.  According to its charter,
4   the primary purpose of the Audit Committee is to "act on behalf" of the Board "in
5   fulfilling the Board's oversight responsibilities" with respect to the financial
6   reporting process, the systems of internal control over financial reporting and
7   financial disclosure and procedures, and the quality and integrity of the Company's
8   financial statements and reports.  The Audit Committee has the authority to retain
9   outside legal and accounting advisors and "shall have full access to all books,
10  records, facilities and personnel of the Company" as necessary to discharge its
11  responsibilities.  Defendants Fazio, Pendarvis, and Slacik failed to ensure that the
12  Company's financial statements and public disclosures were truthful and in
13  compliance with applicable law.  These three defendants also failed to ensure that
14  the Company's internal audit process was sufficient to stop false disclosures.
15  Although the charter of the Sequenom Board's Audit Committee specifically tasks
16  defendants Fazio, Pendarvis, and Slacik with oversight related to major financial
17  risk, they nonetheless participated in a course of conduct that exposed Sequenom to
18  enormous financial risk in the form of penalties, lawsuits, potential loss of ability to
19  participate in government healthcare programs, and loss of market share.  Due to
20  these defendants' breach of their duties, any demand upon them is futile.

21       60.    Defendants Afting, Lai-Goldman, and Lerner are the members of the
22  Nominating and Corporate Governance Committee.  Defendant Afting is the
23  Chairperson.  According to its charter, the Nominating and Corporate Governance
24  Committee is responsible for, among other things, overseeing all aspects of the
25  Company's corporate governance functions, and making recommendations to the
26  Board regarding corporate governance issues.  However, defendants Afting, Lai-
27  Goldman, and Lerner presided over an utter failure of corporate governance by
28  participating in the decision to implement an illegal pricing scheme designed to

artificially inflate the test order volume of the Company's products, and then mislead the public about it.   In so doing, these three defendants breached their fiduciary duties and any demand upon them is futile.

61.   Defendants Buechler, Lerner, and Pendarvis are the members of the Compensation Committee.   Defendant Pendarvis is the Chair.   According to its charter, the Compensation Committee is responsible for, among other things: (a) evaluating risks associated with and potential consequences of the Company's compensation policies and practices, and assessing risks arising from same; and (b) establishing policies for the recovery of erroneously awarded compensation to executive officers.   However, defendants Hixson, Lindsay, and numerous other Sequenom employees improperly were paid bonus or incentive based compensation due to the artificially inflated volumes of test orders during the fourth quarter of 2012 and the first quarter of 2013.   Defendants Buechler, Lerner, and Pendarvis, have taken no action to recover this improperly paid compensation or to change the Company's compensation practices in order to prevent similar problems in the future.   The Company has not disclosed any action taken to freeze any benefits still owed to employees as a result of the improperly paid compensation or to clawback any benefits they may have been paid upon leaving the Company or achieved due to the false statements.   Defendants Buechler, Lerner, and Pendarvis have failed to act in the best interests of the Company and its shareholders.   In so doing, these three defendants breached their fiduciary duties and any demand upon them is futile.

62.   Sequenom's Board is composed of seven directors not employed by the Company: defendants Afting, Buechler, Fazio, Lai-Goldman, Lerner, Pendarvis, and Slacik.   Of these, all seven have breached their fiduciary duties by affirmatively participating the decision to implement the illegal Capping Scheme, and then knowingly permitting the Company to mislead investors about same.   As detailed above, the Company's sales process and the pricing of its tests were at all times a core element of its business.   Each of the Director Defendants could not have been

1    unaware of the importance to the Company of increased test volume or of the harm
2    that would come to the Company from an illegal marketing scheme and false
3    disclosures.    Yet, defendants Afting, Buechler, Fazio, Lai-Goldman, Lerner,
4    Pendarvis, and Slacik permitted the Company to enter a course of conduct that they
5    knew would expose the Company to potentially ruinous legal consequences,
6    artificially inflate the Company's financial results, increase the compensation of
7    defendants Hixson and Lindsay, and which they knew to present serious risks.
8    Demand is futile as to all of the Director Defendants because they face a substantial
9    likelihood of liability due to their breaches of fiduciary duties detailed herein.

10       63.    As particularized herein, to properly prosecute this lawsuit, the
11   Director Defendants would have to sue themselves and the other defendants,
12   requiring them to expose themselves and their comrades to tens of millions of
13   dollars in civil liability and/or sanctions.   This they have refused to do thus far, and
14   will not do in the future.   A majority of the Director Defendants are exposed to
15   potential liability for breaching their fiduciary duties by approving or acceding in an
16   illegal marketing scheme and false disclosures related thereto.   Thus, demand on the
17   Director Defendants is futile.

18       64.    The Sequenom Board is dominated by directors that are specifically
19   implicated in the wrongdoing alleged herein.   All nine of the directors of Sequenom
20   are: (a) primarily employed by the Company; (b) breached their duties as members
21   of a committee that failed to adequately discharge its responsibilities; and/or (c) face
22   a substantial likelihood of liability due to their participation in the approval and
23   implementation of the Capping Scheme.   All nine of the members of the Company's
24   Board were on the Board during the events complained-of herein, knew that false
25   and misleading statements were being made, and declined to take action to remedy
26   them.    As a result, the Board is dominated by persons who are specifically
27   implicated in the wrongdoing and therefore cannot be expected to sue themselves.

28       65.    Sequenom's officers and directors are protected against personal

liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, i.e., monies belonging to the stockholders of Sequenom. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Sequenom against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Sequenom, there would be no directors' and officers' insurance protection and thus, they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile, and therefore, excused.

## <u>COUNT I</u>
### (Breach of Fiduciary Duty)

66.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

67.     Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sequenom's business and affairs, particularly with respect to maintaining compliance with applicable laws and regulations in core areas of the Company's business, as well as controls over disclosure.

68.     Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Sequenom.

69.     In breach of their fiduciary duties owed to Sequenom, defendants

32

willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to properly oversee Sequenom's business, rendering them personally liable to the Company for breaching their fiduciary duties.

70.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, Sequenom has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

<u>**COUNT II**</u>
**(Abuse of Control)**

71.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

72.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sequenom, for which they are legally responsible.

73.     As a direct and proximate result of defendants' abuse of control, Sequenom has sustained significant damages.

74.     As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Sequenom has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

75.     By reason of the foregoing, Sequenom has been damaged.

<u>**PRAYER FOR RELIEF**</u>

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Sequenom and that Plaintiff is an adequate representative of the Company;

B.     Declaring that the Director Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sequenom;

C.     Determining and awarding to Sequenom the damages sustained by it

33

as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.     Directing Sequenom and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Sequenom and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     a provision to permit the shareholders of Sequenom to nominate at least three candidates for election to the Board;

3.     a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.     Determining and awarding to Sequenom exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.     Awarding Sequenom restitution from defendants, and each of them;

G.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

DATED: September 30, 2013        HULETT HARPER STEWART LLP
                                       BLAKE MUIR HARPER


*/s/Blake Muir Harper*

225 Broadway, Suite 1350
San Diego, CA  92101
Telephone:  (619) 338-1133
Facsimile:   (619) 338-1139

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

Attorneys for Plaintiff

## SEQUENOM, INC. VERIFICATION

I hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.


Date: _9/30/13_                                         _Bette D. Borenstein_

                                                        Bette D. Borenstein